# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
May 14, 2024 Session

## STATE OF TENNESSEE v. JEVON BRODIE AND TAVARES HARBISON

**Appeal from the Circuit Court for Montgomery County**
**Nos. 63CC1-2018-CR-1069, CC-2018-CR-1071    Robert Bateman, Judge**

_____

### No. M2023-00135-CCA-R3-CD

_____

A Montgomery County jury convicted the defendants, Jevon Brodie and Tavares Harbison, each of one count of aggravated robbery, one count of theft of property greater than $10,000, but less than $60,000, and one count of theft of property under $500. Brodie was additionally convicted of two counts of reckless homicide and received an effective sentence of sixteen years in confinement. Harbison was also convicted of two counts of criminally negligent homicide and received an effective sentence of fourteen years in confinement. On appeal, the defendants contend that (1) the juvenile court erred in transferring their cases to circuit court without making individualized findings; (2) the evidence was insufficient to sustain a conviction for theft greater than $10,000; and (3) the trial court erred in sentencing the defendants. Additionally, Brodie insists that the trial court erred in instructing the jury on causation and that the prosecutor's statements during summation were improper. Upon review of the record, the parties' briefs, oral arguments, and considering the applicable law, we affirm the decisions of the juvenile and trial courts. However, we remand for the limited consideration by the trial court as to the application of the *Wilkerson* factors in determining the propriety of consecutive sentencing for Tavares Harbison.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court is Affirmed in Part and Remanded in Part**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Patrick T. McNally, Nashville, Tennessee, (on appeal) and Vicki Carriker, Memphis, Tennessee, (at trial) for the appellant, Jevon Letrel Brodie.

Jessica F. Butler, Franklin, Tennessee, (on appeal) and Shelby Silvey, Clarksville, Tennessee, (at trial) for the appellant, Tavares Lee Harbison.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### *Facts and Procedural History*

This case arises from the murder and robbery of Teddy Cook on May 30, 2018. The defendants were thirteen years old at the time of the murder, and the State sought to transfer the case against them to circuit court.

Prior to transfer, a grand jury indicted each teen on one count of first-degree murder in perpetration of a robbery (Count1), one count of first-degree murder in perpetration of a theft (Count 2), one count of aggravated robbery (Count 3), one count of theft of property over $2,500 in value (Count 4), and one count of theft of property under $500 in value (Count 5).

### I.    *Transfer Hearing*

A transfer hearing for the defendants was held on August 1, 2018. At the transfer hearing, the following facts were presented:

At approximately 6 p.m. on May 30, 2018, three teenagers, Jevon Brodie, Tavares Harbison, and Harrison Smith[1], were observed sitting inside the Super Suds Car Wash and Laundry by Corey Coleman, a detective with the Clarksville Police Department (CPD). Detective Coleman, who was in the area investigating an unrelated case, noted their presence due to their young age. A few minutes before 10 p.m. that same evening, Tavares Harbison re-entered the Super Suds laundromat and waived towards the parking lot. In response, Harrison Smith entered the building. Both Harbison and Smith proceeded towards a coin machine located in the laundromat. Teddy Cook, the attendant on duty, approached the two teens. The third teen, Jevon Brodie, entered from the parking lot carrying an Airsoft BB rifle and pointed it at Mr. Cook. During the altercation between Mr. Cook and Brodie, Mr. Cook was knocked to the floor. While Mr. Cook was lying on the floor, Brodie repeatedly hit Mr. Cook in the head with the butt of the BB rifle. Specifically, Brodie hit Mr. Cook in the head three times, and then proceeded to kick him

---

[1] Harrison Smith was a co-defendant during the transfer phase of the case. Smith's case was concluded prior to trial, and he is not a party to the instant appeal.

eight times.  While Brodie was assaulting Mr. Cook, Harbison and Smith proceeded to damage the coin machine to gain possession of the money inside.

While Mr. Cook was still on the ground, Harbison reached into Mr. Cook's clothing, removed and destroyed his cell phone, breaking it in half.  Harbison, then, reached into Mr. Cook's pockets again, and removed the keys to his vehicle, a Chevy Colorado.  The teens took the coins from the machine and fled the scene in Mr. Cook's vehicle.

After the teens fled the scene, Mr. Cook was able to reach the business's telephone and call 911.  In response to the 911 call, Detective Coleman was dispatched to the scene. When he arrived at the Super Suds, he discovered a broken flip phone, a table surrounded with a large pool of blood, and a buttstock of a rifle lying in the blood.  He also noted the coin machine had been pulled off the wall and tampered with.  With the assistance of Joseph Whitwell, an employee of the Super Suds, Detective Coleman retrieved the business's security footage.  Using footage of the teens from approximately 6 p.m., Detective Coleman captured still images of the teens' faces.

Using these photos, Detective Coleman was able to successfully identify the teens. Heather Hill, a patrol officer with CPD, identified Jevon Brodie from an unrelated interview two weeks prior to the assault.  Henry Hopson, a custodian at Kenwood Middle School, identified Tavares Harbison from encounters at school.

During the investigation, the lead detective on this case, Justin Bailey, interviewed Brodie and Harbison.  During his interview, Brodie admitted to being inside Mr. Cook's vehicle and abandoning it, while Harbison chose not to make a statement.  Detective Nathan Lee, Detective Bailey's partner, interviewed Harrison Smith, the third teen.  Smith, whom Detective Lee described as remorseful and cooperative, admitted to the teens' planning of the robbery and led Detective Lee to a shed near his home.  Inside the shed, Detective Lee found the hooded sweatshirts worn during the robbery, the BB rifle, approximately $30 in coins, and two laptops.  The BB rifle was missing its buttstock.  Mr. Cook's vehicle was also located by the detectives near Harbison's residence.

On June 9, 2018, Mr. Cook died as a result of the injuries inflicted during the robbery.

Dr. Jenny Berryman, a psychologist, evaluated each of the teens prior to the transfer hearing for the limited purpose of determining their commitability or intellectual disability. At the transfer hearing, Dr. Berryman testified that during her interviews, each of the teens denied being suicidal or having homicidal ideations, markers used to determine their commitability.  They also denied being placed in special education classes in school, evidence of an intellectual disability.  Dr. Berryman stated that Harbison acknowledged a

prior suicide attempt that led to hospitalization; however, Harbison denied being currently suicidal. Dr. Berryman further stated that she was unaware of any suicide attempts by Harbison while in detention. Therefore, Dr. Berryman concluded that each of the teens was non-committable and did not suffer an intellectual disability.

Harbison's mother and grandmother also testified to his prior suicide attempt and to his good character prior to the robbery. Harbison's mother, Macorya Harbison, testified she had contacted Centerstone, a mental health provider, a week prior to the robbery, seeking additional treatment for her son due to ongoing suicidal thoughts. Harbison's grandmother, Tonya Hickerson, testified that Harbison attempted suicide several times while in juvenile detention.

At the conclusion of the hearing, the juvenile court found that the surveillance footage of the robbery showed the teens "brutally, brutally" beat and kick the victim. "Crux is you planned a robbery. You delivered blows to an individual resulting in death. You committed the robbery." The juvenile court found the teens had "destroyed a life over $30." Ultimately, the juvenile court concluded it would sign the transfer orders stating, "[o]nly place I think this community or the State of Tennessee can deal with this matter is in Circuit Court, not in Juvenile Court." The juvenile court then entered written "Findings of Fact Pursuant to T.C.A. 37-1-134" assessing the required criteria for transfer and factors in determining its suitability for each defendant.

## II.    Trial

In addition to the factual testimony presented at the transfer hearing, the following facts were presented at trial:

Stella Cook testified that her husband, Mr. Cook, was 71 years old when the robbery occurred. For several years prior to the robbery, Mr. Cook had been prescribed Coumadin, a blood-thinning medication, due to a mechanical heart valve. In addition, the vehicle that was taken during the robbery was a 2015 Chevy Colorado belonging to her husband. At that time, there was an outstanding debt of $11,000 on the vehicle. Ultimately, due to Mr. Cook's death, the vehicle was surrendered to the creditor.

As a result of the attack, Mr. Cook received medical treatment from a local hospital in Montgomery County. There, he was diagnosed with a subdural hematoma due to the trauma inflicted to his head. He was moved to Skyline Medical Center for specialized treatment. Dr. Darrell Hunt, an expert in trauma surgery, and one of Mr. Cook's treating physicians at Skyline, made the determination to administer a medication intended to reverse the Coumadin in Mr. Cook's system to help stabilize the brain bleed. A decision was then made to restart administering a blood-thinner, Heparin. The Heparin, in turn,

worsened the bleeding in Mr. Cook's brain. An emergent CAT Scan revealed that he was suffering from a growth of the previous bleed and a second bleed. Mr. Cook was rushed into emergency surgery to attempt to drain the blood. After the surgery, Mr. Cook was once again taken off the blood thinner, resulting in multiple strokes due to his mechanical heart valve. He never regained consciousness after the surgery. His family, ultimately, made the decision to cease life support, and he died soon after.

Dr. Feng Li, the chief medical examiner for Nashville and Davidson County, testified as an expert in forensic pathology. He testified that Mr. Cook suffered injuries to his brain and contusions to his face, head, and cheeks as a result of the assault. Dr. Li found that the injuries to Mr. Cook's head included bleeding through the skin, below the bone and dura, indicating that "everywhere in his brain was bleeding." The cause of his death was ruled a homicide, due to the multiple blunt-force injuries to his brain. This opinion was seconded by Dr. Hunt, Mr. Cook's treating physician, who also testified that Mr. Cook's death was caused by multiple blows to the head, and that absent those blows, he would have lived a "normal life."

Agent Brooke Duke, a forensic scientist with the Tennessee Bureau of Investigation Crime Lab, testified as an expert in microanalysis. She testified that the rubber buttstock found in the blood at the Super Suds fit the butt of the BB rifle found in the shed. Agent Greg Fort, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") Crime Lab, testified as an expert in forensic biology. He testified that he conducted an analysis of the blood and other DNA on the rifle. The blood on the rifle was a match for Mr. Cook and the other DNA on the rifle was a mixture of two individuals. The minor DNA contributor was an inconclusive match, but the major contributor of DNA on the BB rifle was Brodie.

The defendants did not present any proof on their own behalf.

After the close of evidence, the trial court charged the jury. The trial court included a general causation instruction, modeled closely on Tennessee Pattern Jury Instruction: Criminal §42:14. The instruction, as given, stated:

> Before the defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant, by the conduct of another, for whom the defendant is criminally responsible, or both. The proximate cause of a death is that cause which, in natural and continuous sequence, unbroken by any independent intervening cause, produces the death and without which the death would not have occurred.

The defendant's conduct, or the conduct of one for whom the defendant is criminally responsible, need not be the sole or immediate cause of death. The acts or omissions of two or more persons may work concurrently to proximately cause the death, and in such a case, each of the participating acts or omissions is regarded as a proximate cause. It is not a defense that the negligent conduct of the deceased may also have been a proximate cause of the death.

However, it is a defense to homicide if the proof shows that the death was caused by an independent intervening act or omission of the deceased or another which the defendant, in the exercise of ordinary care, could not reasonably have anticipated as likely to happen.

However, if, in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original conduct, and the defendant's conduct is considered the proximate cause of death. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death fall within the general field of danger which the defendant should have reasonably anticipated.

If some other circumstance caused the victim's death, unrelated to the defendant's actions, that would be a defense to homicide unless the circumstance was the natural result of the defendant's act.

If there is evidence in this case that the deceased required medical attention as a result of injuries that may have been unlawfully inflicted by the defendant, or one for whom the defendant is criminally responsible, and if you find that such treatment itself may have contributed to the death of the deceased, then you must determine whether the [medical] treatment is of such character as to relieve the defendant of the responsibility for the death.

One who unlawfully and seriously injures another to the extent that medical attention is required bears the risk that improper treatment may result in the death of the injured person. If the defendant, or one for whom the defendant is criminally responsible, unlawfully and seriously injured the deceased, he is not relieved of responsibility unless the treatment was performed in a grossly negligent and unskillful manner and unless it was the sole cause of the death.

If you find that the defendant's act or the acts of a person for whom the defendant is criminally responsible, or the acts of both, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must find him not guilty.

The jury returned a verdict of guilt for Jevon Brodie on two counts of reckless homicide, one count of aggravated robbery, one count of theft of property greater than $10,000, but less than $60,000, and one count of theft of property under $500. The jury returned a verdict of guilt for Tavares Harbison on two counts of criminally negligent homicide, one count of aggravated robbery, one count of theft of property greater than $10,000, but less than $60,000, and one count of theft of property less than $500.

### III.    Sentencing Hearing

#### a.  Jevon Brodie

A sentencing hearing for Jevon Brodie was held on January 21, 2022. At the hearing, the State introduced testimony of Ms. Stella Cook concerning the devastating effect of the defendant's actions on her family. Additionally, the State introduced the presentence report for Brodie.

After the State submitted its proof, Brodie called his brother, Donte Brodie. Donte Brodie[2] testified his brother's home life was hectic and "pretty traumatizing." After their parents separated, Donte Brodie and his brother lived primarily with their mother, until joint custody was awarded to their father. Donte Brodie testified that he and his brother "[didn't] know how to act when … going from one house with one set of rules to another house with another set of rules. It's very confusing and contradicting." Donte Brodie described his brother as having "free reign over the neighborhood." In a letter to the trial court, Donte Brodie stated that his brother "wants to finish school, live an honest life, and do some sort of good in his life." Donte Brodie described the defendant as "remorseful and that he wants to do something to better his community."

Brodie also called Dr. Julie Gallagher to testify via teleconference. Dr. Gallagher, an expert in forensic psychology with special training in juvenile forensics, testified she had reviewed Brodie's educational records and interviews with Brodie's family members, conducted several tests with Brodie, and interviewed his mother. As a result, Dr. Gallagher found that Brodie had suffered five "Adverse Childhood Experiences" in his history, where most people have one or two. One such experience was being verbally abused by his father.

---

[2] Due to the similarity of names and to avoid confusion, Donte Brodie is referenced by his full name and Jevon Brodie is referenced as the defendant.

To avoid being at home, Brodie said he would "run the streets." At home, he would be argumentative and noncompliant. Dr. Gallagher concluded from her testing that, although Brodie appeared to look like an adult, his mental development was much slower. For example, in one test Brodie scored in the 5th percentile in verbal comprehension and in the low-average range of other aspects of his IQ. Dr. Gallagher determined that because Brodie was only 14 years old at the time of the crime, his brain had not fully developed and that he was capable of rehabilitation with the right resources.

The defendant read a letter of remorse into the record.

Ultimately, the trial court stated it "considered the evidence presented by both parties, the presentence report, the principles of sentencing and the arguments of counsel, the nature and characteristic[s] of the criminal conduct involved, and all the other requirements of 40-35-210." The trial court further considered the mitigating factors presented by Brodie and found that his age was an applicable factor under Tenn. Code Ann. § 40-35-113. As to the enhancement factors presented by the State, the trial court applied several factors: the defendant was a leader in the commission of the offense, the victim was particularly vulnerable because of his age, the defendant treated the victim with exceptional cruelty, and the defendant employed a firearm, explosive device, or other deadly weapon during the commission of an offense.[3] *See* Tenn. Code Ann. § 40-35-114.

Based on these findings, the trial court sentenced Brodie to four years confinement for reckless homicide and twelve years confinement for aggravated robbery, the maximum sentences for a Range I offender.[4] The trial court further determined consecutive sentences were appropriate, because the court "saw the proof . . . that Mr. Cook was, first of all, pushed down [to] the ground, and then after that he was hit . . . several times with the Airsoft rifle, and then kicked in the head." Based on that proof, the trial court found Brodie to be a dangerous offender whose behavior indicated little or no regard for human life or no hesitation for committing the crime. Further, the trial court found that consecutive sentencing would be "necessary to protect the public from further acts of crime from this [d]efendant," and that the sentence was reasonably related to the severity of the offense.

### b. Tavares Harbison

---

[3] The trial court made a specific finding that although the "firearm" used during the offense was a BB rifle, the "manner in which the weapon was used was a deadly weapon."

[4] The trial court merged the two reckless homicide convictions (Counts 1 and 2) and merged the convictions for theft of property greater than $10,000, but less than $60,000, and theft of property less than $500 with the conviction for aggravated robbery (Counts 3, 4, and 5).

A sentencing hearing for Tavares Harbison was held on July 22, 2022. At the hearing, the State introduced testimony of Ms. Stella Cook concerning the effects of the defendant's actions on her family. Additionally, the State introduced the presentence report for Harbison.

After the State submitted its proof, Harbison read a letter into the record reflecting his remorse for the crime. He also called Chief Deputy Thomas of Montgomery County Jail who testified that Harbison had not received any educational services while in jail and voiced concerns about the isolation a juvenile offender faces at an adult detention facility. Next, Mary Davila, an employee with the Montgomery County School System, testified that the last date the school system provided educational services to Harbison was August 6, 2018, almost four years prior to the hearing.

Harbison also presented the testimony of Dr. Bradley Freeman, a clinical psychiatrist at Vanderbilt University Medical Center. Dr. Freeman testified that upon evaluation, he diagnosed Harbison with post-traumatic stress disorder, adjustment disorder with depressive features, conduct disorder, and cannabis use disorder. In addition, Dr. Freeman testified that teenagers "tend to be generally impulsive, engaging in risk-taking behaviors," but "when they move into their early 20s, their brain changes in such a way they're able to have [a] more rational thought process." Based upon this developmental process and his examination, Dr. Freeman concluded that Harbison was a "good candidate" for rehabilitation.

Next, Tonya Hickerson, Harbison's grandmother, testified that Harbison had moved to Montgomery County to live with his mother only two weeks before the crime. She also testified she had experience with a rehabilitation group, 4:13 Strong, a mentoring group for young men on the streets. Her youngest son, Traveno Fuquia, had been confined to prison at one time, but he now owned his own business with the help of 4:13 Strong. Ms. Hickerson stated that Harbison could be rehabilitated through a similar group.

The trial court, upon rendering its decision, stated it had "considered the evidence at the trial, the evidence at this sentencing hearing, the Presentence Report, the arguments by counsel by both parties, the nature and characteristics of the criminal conduct, the evidence and information offered by the parties on mitigation and enhancement and certain statistical information on sentencing provided by the Administrative Office of the Courts." The trial court considered the statement of remorse made by Harbison on his own behalf and the risk and needs assessments as conducted and contained in the presentence report.

The trial court stated that it was required to impose confinement for the conviction of aggravated robbery. For the other counts, the trial court found under Tennessee Code Annotated § 40-35-103(1)(B) that confinement was necessary to avoid depreciating the

- 9 -

seriousness of the offense and was particularly suited to provide an effective deterrence to others likely to commit similar offenses. Ultimately, the trial court ordered Harbison to serve the entirety of his sentence with the Tennessee Department of Correction because confinement was necessary to provide a deterrence to others likely to commit similar offenses.

As to the enhancement factors, the trial court applied several factors: the defendant was a leader in the commission of an offense by "going in first and motioning Mr. Brodie into the laundromat," the victim was particularly vulnerable because of his age, the defendant allowed the victim to be treated with exceptional cruelty, and the defendant had no hesitation about committing a crime when the risk to human life was high. The trial court also found Harbison's age at the time of the crime to be a mitigating factor.

Based on these findings, the trial court sentenced Harbison to two years confinement for criminally negligent homicide and twelve years confinement for aggravated robbery, the maximum sentences for a Range I offender.[5]

The trial court found consecutive sentences were appropriate as to Harbison, as well. "Although Mr. Harbison did express remorse. . . the severity of the crime and the complete disregard for the life of Mr. Cook," meant that consecutive sentences were "necessary to protect the public from further criminal acts of this defendant and the other defendants, and the sentence was reasonably related to the severity of the offense."

On February 15, 2022, and August 19, 2022, Brodie and Harbison, respectively, filed Motions for New Trial, which were denied by the trial court. The defendants filed timely appeals, which were consolidated herein.

### *Analysis*

On appeal, both defendants contend that (1) the juvenile court erred by transferring the defendant to circuit court without individualized findings; (2) the State failed to present sufficient evidence to support the conviction for theft over $10,000; and (3) the trial court erred in sentencing. Additionally, Brodie insists that the prosecutor's statements about other crimes during summation were improper and that the trial court erred in instructing the jury as to causation.

---

[5] The trial court merged the two criminally negligent convictions (Counts 1 and 2) and also merged the convictions for theft of property greater than $10,000, but less than $60,000, and theft of property less than $500 with the conviction for aggravated robbery (Counts 3, 4, and 5).

- 10 -

The State submits that the juvenile court did not abuse its discretion in transferring the defendants to circuit court, the evidence was sufficient to convict the defendants of theft greater than $10,000, but less than $60,000, the trial court properly instructed the jury as to causation, the State's closing argument was not plain error, and the trial court's sentencing of the defendants was not an abuse of discretion.

## I.     Transfer to Circuit Court

The statute governing juvenile transfers provides that after a delinquency petition has been filed, the juvenile court "may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." Tenn. Code Ann. § 37-1-134(a). The statute further requires that the disposition of the child shall be as if the child were an adult if: (1) as applied to this case, the child was less than fourteen years of age at the time of the alleged conduct and charged with first degree murder or second degree murder or attempted first or second degree murder, (2) a hearing was held in conformity with the statute, (3) the notice requirements were met, and (4) the court finds probable cause to believe that:

(A) The child committed the delinquent act as alleged;
(B) The child is not committable to an institution for the developmentally disabled or mentally ill; and
(C) The interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a)(1)-(4). Accordingly, a transfer from juvenile court is discretionary unless the grounds in subsection (a) are established. *Howell v. State*, 185 S.W.3d 319, 329 (Tenn. 2006). The statute also requires the juvenile court to consider certain factors in determining whether transfer is appropriate:

(b) In making the determination required by subsection (a), the court shall consider, among other matters:

(1) The extent and nature of the child's prior delinquency records;
(2) The nature of past treatment efforts and the nature of the child's response thereto;
(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(4) Whether the offense was committed in an aggressive and premeditated manner;
(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.[6]

Tenn. Code Ann. § 37-1-134(b).

This Court has previously stated that in reviewing a transfer decision, we do not evaluate the preponderance of the evidence but review to determine whether there are reasonable grounds or probable cause to support the decision to transfer. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975); *State v. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6, *10 (Tenn. Crim. App. Aug. 31, 2010) (noting the terms "probable cause" and "reasonable grounds" are used "interchangeably" in juvenile transfer analysis), *perm. app. denied* (Tenn. Jan. 13, 2011). This Court reviews a juvenile court's findings for an abuse of discretion. *State v. Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *38 (Tenn. Crim. App. Jan. 16, 2015) ("A juvenile court's findings in determining whether reasonable grounds exist to establish the criteria in subsection (a)(4) are reviewed for an abuse of discretion."), *perm. app. denied* (Tenn. May 14, 2015). The juvenile court is afforded "a wide range of discretion" in determining whether to transfer a child from juvenile to criminal court. *Strickland*, 532 S.W.2d at 920. However, a transfer from juvenile court is mandatory once the grounds in subsection (a) are established. *Howell*, 185 S.W.3d at 329. "If there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the defendant was not mentally impaired and should be legally restrained, a juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal." *Reed*, 2010 WL 3432663, at *6.

The record reflects the evidence presented at the transfer hearing was sufficient to give the juvenile court reasonable grounds to find that each of the defendants committed and participated in the robbery and homicide of Teddy Cook, as well as the theft of the vehicle and money. Detectives Coleman, Lee, and Bailey testified to each of the defendants' participation in the planning and execution of the robbery, the attack on Mr. Cook, and their escape in Mr. Cook's vehicle with the money from the coin machine. The State also entered the security footage of the robbery into evidence. Therefore, the trial court had reasonable grounds to find that the first criteria under Tennessee Code Annotated § 37-1-134(a)(1) was met.

Under the second criteria, the record also reflects sufficient evidence for the juvenile court to find that the defendants were not mentally ill or intellectually disabled. Dr. Jenny

---

[6] In 2023, our legislature added an additional factor for juvenile courts to consider in determining whether transfer is appropriate: Whether the child has a history of trauma or abuse, including, but not limited to, the child's being a victim of a human trafficking offense as defined in section 39-13-314. *See* Tenn. Code Ann. § 37-1-134(b)(7).

- 12 -

Berryman, an expert psychologist, testified it was her professional opinion neither defendant met the criteria for involuntary commitment. Brodie offered no contrary evidence to this finding, while Harbison attempted to refute Dr. Berryman's finding through testimony of his previous hospitalization after a suicide attempt. However, Dr. Berryman, knowing of Harbison's prior hospitalization, testified that because Harbison denied any current suicidal or homicidal ideations, he was not presently committable. Therefore, it was reasonable for the juvenile court to find the defendants were not committable based upon the psychological assessment of each defendant.

Finally, the record supports the juvenile court's findings that it was in the best interest of the community for the defendants to be tried as adults. Evidence at the hearing established the delinquent act was planned and aggressive towards a person. The court noted the sheer brutality of the teens' actions of delivering "lethal blows during a planned robbery." Therefore, the court's belief that it was in the interest of the community that the defendants be restrained or disciplined by the circuit court was reasonable.

Based on the above evidence presented at the transfer hearing, the juvenile court had a reasonable belief to find all three statutory criteria enumerated in Tenn. Code. Ann. § 37-1-134(a) had been met. Accordingly, the juvenile court's determination to transfer the defendants to circuit court will not be disturbed. The defendants are not entitled to relief on this issue.

Brodie and Harbison, however, contend the juvenile court's failure to make individual oral findings on the above criteria was error. Yet, the record reflects that the juvenile court judge did evaluate and consider each factor individually for each defendant in its written findings. In the juvenile court's "Finding of Fact Pursuant to T.C.A. 37-1-134," the juvenile court assessed each required criterion and the factors it considered in its determination to transfer. For Brodie, the judge found that every criterion was met and made a special notation of the aggressive and planned nature of the act against a person. For Harbison, the juvenile court judge noted that each criterion was met, along with a special notation that the act was aggressive and against a person. Therefore, the record reflects that the juvenile court appropriately fulfilled the statutory requirements prior to transferring the defendants to circuit court. The defendants' argument on this issue is without merit.

## II.    Sufficiency of Evidence as to Theft of Property Greater Than $10,000

The defendants next challenge the sufficiency of the evidence, specifically arguing the State failed to present evidence that Mr. Cook's vehicle had a value of greater than $10,000.

- 13 -

### a. Standard of Review

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus[,] the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and

inconsistent with innocence are questions primarily for the jury. *See id.* Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

### b. Theft of Property under Tenn. Code Ann. § 39-14-103(a)

On appeal, Brodie asserts the evidence at trial was insufficient because the State failed to prove the defendants had the requisite intent and that the vehicle had a value greater than $10,000. He, consequently, argues that the proof adduced at trial was only sufficient to show he committed the offense of joyriding. *See* Tenn. Code Ann. § 39-14-106. Harbison, similarly, contends that the State did not establish the value of the vehicle beyond a reasonable doubt. The State contends the jury could have reasonably concluded from several points of evidence that the defendants intended to deprive Mr. Cook of his vehicle when they fled the scene. The State also argues that the jury could have reasonably concluded that the value of the vehicle was greater than $10,000 through the testimony presented at trial. We agree with the State.

#### i. *Intent to Permanently Deprive*

A person "commits theft of property if, with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). In addition, "'deprive' means to," as relevant to this case, "withhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." *Id*. § 39-11-106(a)(9)(A). "The intent to deprive may be based solely upon circumstantial evidence, and a 'jury may infer a. . . defendant's intent from the surrounding facts and circumstances." *State v. Smith*, W2023-00482-CCA-R3-CD, 2024 WL 863301, *6 (Tenn. Crim. App. Feb. 29, 2024) (quoting *State v. Stewart*, No. M2019-01421-CCA-R3-CD, 2020 WL 6494838, at *11 (Tenn. Crim. App. Nov. 5, 2020) (omission in original)). "Moreover, the fact that the [defendant] did not possess the owner's property for an extended period 'does not preclude a jury from finding that he possessed the requisite intent for theft.'" *Id.* (quoting *State v. Hicks*, No. W2022-00920-CCA-R3-CD, 2023 WL 4230430, at *4 (Tenn. Crim. App. June 28, 2023)).

In the instant case, the security footage showed that after the defendants assaulted Mr. Cook, Harbison reached into Mr. Cook's pockets and took the keys to his vehicle. The vehicle was used by the teens to flee the scene and was later discovered near Harbison's residence. After examining the evidence in a light most favorable to the State, we conclude the proof was sufficient for a rational jury to find beyond a reasonable doubt that when the

defendants took the vehicle, they possessed the requisite "intent to deprive" as defined in Tenn. Code Ann. § 39-11-106(a)(9)(A).

We are unpersuaded by the defendants' argument that the defendants' abandonment of the vehicle revealed the temporariness of their intent. The State was only required to prove beyond a reasonable doubt that the defendants intended to deprive the owner of the vehicle at the moment they drove it away, not that the defendants intended to permanently possess it. Indeed, this Court previously held in *State v. Reed* that even when a defendant left a vehicle within plain view of the victim's residence, it was not indicative of a lack of intent, but "perhaps merely poor planning." No. M2020-00677-CCA-R3-CD, 2021 WL 4987974, at *2 (Tenn. Crim. App. Oct. 27, 2021). Accordingly, we conclude the evidence was sufficient to find the defendants possessed the requisite intent to deprive under Tenn. Code Ann. § 39-14-103(a).

### ii. Value of the Vehicle

Although the statute defining theft does not contain "an element regarding the value of the property stolen," the value "must be determined in order to establish the grade of theft offense." *State v. Moats*, No. E2019-02244-CCA-R3-CD, 2020 WL 6392483, at *3 (Tenn. Crim. App. Nov. 2, 2020) (quoting *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019); *see also State v. Sumpter*, No. W2021-00119-CCA-R3-CD, 2022 WL 946570, *11 (Tenn. Crim. App. Mar. 30, 2022). "Whenever a determination of value is necessary to assess the class of an offense in this code or the level of punishment, the determination of value shall be made by the trier of fact beyond a reasonable doubt." Tenn. Code Ann. § 39-11-115. Theft of property valued at greater than $10,000, but less than $60,000, is a Class C Felony. *See* Tenn. Code Ann. § 39-14-105(a)(4).

Tennessee Code Annotated § 39-11-106 defines "value" as "(i) [t]he fair market value of the property or service at the time and place of the offense; or (ii) [i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Tenn. Code Ann. § 39-11-106(a)(39)(A). The fair market value of property is a question of fact for the jury. *State v. Stitts*, No. W2011-02673-CCA-R3-CD, 2013 WL 257069, *5 (Tenn. Crim. App. Jan. 23, 2013). "The market value of the article stolen, and not its original cost, is the true criterion when it is necessary to establish the value of the property in order to fix the grade of the offense[.]" *Id.* (citing *State v. Hamm*, 611 S.W.2d 826, 829 (Tenn. 1981). The jury can use its "common sense" in making its determination regarding the value of stolen goods. *See State v. Sydnor*, No. M2007-02393-CCA-R3-CD, 2010 WL 366670, *20 (Tenn. Crim. App. Feb. 2, 2010).

While the State did not present a value assessment of the truck or an opinion from one able to provide it, it did, nonetheless, provide proof from which a reasonable jury could

find beyond a reasonable doubt that the truck's fair market value was greater than $10,000. At trial, Stella Cook, Mr. Cook's widow, testified that at the time of the robbery, $11,000 was owed on the vehicle. The truck was a 2015 Chevrolet Colorado truck, meaning it was only three years old at the time it was stolen. The truck was returned to Ms. Cook in working order after it was recovered by law enforcement. Unfortunately, after Mr. Cook's death, she could no longer afford the payments on the truck and, thus, allowed the creditor to reclaim the vehicle in exchange for forgiveness of the $11,000 debt. While taking the vehicle in exchange for the $11,000 debt is not direct evidence of its fair market value, it is a factor that may be considered by the jury in assessing the value of the truck. *See Predergast v. State*¸ No. M2013-02869-CCA-R3-ECN, 2015 WL 9488423, at *11 (Tenn. Crim. App. Dec. 29, 2015), *no perm. app. filed.* Viewed in the light most favorable to the State, the testimony presented at trial--the exchange of a vehicle for the forgiveness of debt, the fact the truck was only three years old, and the fact the truck was still operable--is sufficient to establish the value of the vehicle at the time of the robbery as $11,000.

The jury, as the trier of fact, is entrusted with determining the value of the theft, the weight of the evidence, and evaluating the credibility of witnesses, and based on the verdict, the jury found the value of the vehicle to be greater than $10,000. Accordingly, the evidence is sufficient for a jury to convict the defendant of theft of property over $10,000, but less than $60,000. The defendants are not entitled to relief on this issue.

## III.   Jury Instruction on Causation

Brodie appeals the trial court's use of the State's requested jury instruction regarding causation of homicide. Specifically, Brodie argues that the jury instruction misstated the applicable law and improperly commented on the evidence. The State contends the trial court correctly instructed the jury. We agree with the State.

Questions involving the propriety of jury instructions are mixed questions of law and fact, therefore, our standard of review is *de novo* with no presumption of correctness. *See State v. Cole-Pugh*, 588 S.W.3d 254, 259-60 (Tenn. 2019). It is well-settled in Tennessee that a "defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 873, S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

Here, Brodie contends that the jury instruction on causation was a misstatement of law because the reckless homicide statute does not include a proximate cause element. This argument is without merit. While the statute on reckless homicide, Tennessee Code Annotated § 39-11-302(c), does not explicitly include proximate cause, theories of criminal responsibility, or intervening causation, those elements of criminal law are inherently encompassed. The theory of proximate cause is an inherent pillar of criminal responsibility in Tennessee. "One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause." *Odeneal v. State*, 157 S.W. 419, 421 (Tenn. 1913). Additionally, our supreme court has made clear that "causation is an essential element of every homicide offense." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001). Therefore, the jury instruction on proximate cause was not a misstatement of law.

Brodie also argues that the jury instruction was an improper comment on the evidence by the trial judge. This argument, too, is without merit. The instruction issued by the trial judge is a near verbatim recital of the pattern jury instruction. *See* Tennessee Pattern Jury Instruction: Criminal §42.12. Furthermore, the instruction, as given by the trial court, did not mention any actual evidence presented at trial and, therefore, cannot be deemed an improper comment. The defendant is not entitled to relief on this issue.

## IV.    State's Closing Argument

Brodie next argues that the State's closing argument included a "highly improper and inflammatory" statement that constituted prosecutorial misconduct. The State submits that the defendant has waived consideration of the issue by failing to object to the comment at trial and that the comment does not rise to the level of plain error. We agree with the State.

> During closing argument, the prosecutor made the following statements:
> They entered into a scheme to commit the robbery and a theft and Mr. Cook was killed. Doesn't matter if Mr. Harbison knew or contemplated or thought it would happen. Once one of his compadres that he went into that store with, he went into the laundromat with, to commit these and when one of his partners killed Mr. Cook, Mr. Harbison is guilty just like Mr. Brodie. That is the law. That's the way it is. And there's reasons for that, right? We want to leave victims alive even if they're being robbed, even if you're stealing from them, you're burglarizing their house, you're raping a person, you're kidnapping a person, you're abusing a child; if you kill them, whoever's involved in it, it's first degree murder in perpetration of that crime.

- 18 -

Closing arguments are an important tool during trial, so attorneys are given a wide-range of autonomy when making them, and the trial court has a wide-range of discretion when controlling them. *See State v. Carruthers*, 35 S.W.3d 516, 577-8 (Tenn. 2000). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). It is possible for five general areas of prosecutorial misconduct to occur during closing arguments:

(1) Intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence of the defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Id.* "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

"Plain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). Because it is "incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" as "[a] contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). Failure to contemporaneously object is a failure to preserve the issue for appeal.

However, an appellate court may review an unpreserved error pursuant to the plain error doctrine, if the defendant bears their burden to show that all five prerequisites are satisfied:

(1) The record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

- 19 -

*State v. Dotson*, 450 S.W.3d 1, 49 (Tenn. 2014) (quoting *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007)). "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

Here, Brodie first raised the issue of prosecutorial misconduct in his motion for new trial after failing to preserve the issue with a contemporaneous objection. Therefore, plain error review must apply. "Only in 'exceptional circumstances' do errors reviewed under the plain error doctrine warrant reversal." *State v. Banks*, 271 S.W.3d 90, 132 n.30 (Tenn. 2008).

Brodie's argument on appeal is that the State, in its summation, mentioned other crimes such as rape and kidnapping to inflame the jury. The defendant alleges the State improperly used a "safe streets" argument to "appeal to jurors' generalized fear of crime" to "suggest that the defendant or the crime is so dangerous that the jury must convict the defendant 'to protect public safety.'" *United States v. Smith*, 629 F. App'x 135, 136-37 (2d Cir. 2015). The State responds that the prosecutor's comment was not a "safe streets" argument, but instead an explanation of how and when felony murder charges are sought. We agree with the State. The prosecutor's statement, when read *in totum*, demonstrates that the prosecutor's intention was to explain the concept of felony murder to the jury when it mentioned other crimes. Therefore, the defendant has failed to show that "a clear and unequivocal rule of law has been breached," and no plain error can be found.

In addition, Brodie has failed to show that a substantial right has been adversely affected. "For a 'substantial right' of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings." *State v. Rimmer*, 623 S.W.3d 235, 278 (Tenn. 2021) (quoting *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005)). Here, overwhelming evidence supported the jury's conclusion that Brodie committed the crime for which he was convicted. The surveillance footage showed him enter the laundromat armed with a BB rifle and use the rifle to hit Mr. Cook on the head repeatedly. Brodie's DNA and Mr. Cook's blood were both recovered from the rifle. Mr. Cook. died because of the injuries inflicted by Brodie. Considering the overwhelming evidence, Brodie has failed to show that the alleged prosecutorial misconduct affected the outcome of the trial court proceedings.

Moreover, Brodie has failed to establish that defense counsel's failure to contemporaneously object was not strategic. "[I]t is well-established that the plain error rule is not applicable when the record reflects that a defendant made a deliberate, tactical choice to waive an objection." *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000); *State v.*

*Spears*, No. M2023-00346-CCA-R3-CD, 2024 WL 391019 (Tenn. Crim. App. Feb. 2, 2024). Here, however, there is nothing in the record to suggest the failure of the defendant's trial counsel to object to the prosecutor's statements during the trial was not strategic.

Because Brodie has failed to establish the criteria required to allow this Court to review the unpreserved issue, he is not entitled to relief.

## V.    Trial Court's Sentencing

### a.  Length of Defendants' Sentences

The defendants also appeal the trial court's decision to impose the maximum sentences authorized by statute. Brodie does not challenge the trial court's application of any enhancement factors, instead, he argues simply that imposing a consecutive maximum sentence is excessive. Harbison argues the trial court's imposition of the maximum sentence was in error because it "simply disregarded evidence that supported mitigation." The State contends the trial court properly determined the length of each defendants' sentence based on the application of enhancement and mitigating factors. We agree with the State.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Sentences that are within range for the offender, supported by the record, and reflect that the trial court properly applied the purposes and principles of sentencing are reviewed for an abuse of discretion, with a presumption of reasonableness. *State v. Bise,* 380 S.W.3d 682, 707-8 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if

we had preferred a different result. *See State v. Carter,* 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id.* § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "(A) what enhancement or mitigating factors were considered, if any; (B) the reasons for the sentence; and (C) for a sentence of continuous confinement, the estimated number of years and months the defendant will serve before becoming eligible for release." *Id.* § 40-35-210(e)(1). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter,* 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon the appellant. *State v. Moore,* No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995) (citation omitted). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter,* 254 S.W.3d at 345 (citing *State v. Banks,* No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected,* 271 S.W.3d 90 (Tenn. 2008)).

During the sentencing hearing for Brodie, the trial court explicitly stated that it reviewed the evidence, the presentence report, the principles of sentencing and the arguments of counsel, the nature and character of the criminal conduct involved, and all the other requirements of Tennessee Code Annotated §40-35-210. Further, the trial court applied the following enhancement factors: (1) Brodie was a leader in the commission of the offense, (2) Mr. Cook was particularly vulnerable because of his age, (3) Brodie treated Mr. Cook with exceptional cruelty during the commission of the offense, and (4) Brodie possessed or employed a deadly weapon during the commission of the offense. *See* Tenn. Code Ann. § 40-35-114. The trial court also took into consideration Brodie's age as an applicable mitigating factor. *See* Tenn. Code Ann. § 40-35-113.

During the sentencing hearing for Harbison, the trial court stated on the record it considered the principles and purposes of sentencing under Tennessee Code Annotated §§ 40-35-102 and -103, the evidence at trial and the sentencing hearing, the presentence report, the arguments by counsel, the nature and characteristics of the criminal conduct, the evidence and information offered on enhancement and mitigating factors, as well as statistical information on sentencing provided by the Administrative Office of the Courts.

The trial court stated the following applicable enhancement factors: (1) Harbison was a leader in the commission of the offense, (2) Mr. Cook was particularly vulnerable because of his age, (3) Harbison allowed Mr. Cook to be treated with exceptional cruelty, and (4) Harbison had no hesitation about committing a crime when the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114. The trial court also took into consideration Harbison's own statement of remorse and his age as applicable mitigating factors. *See* Tenn. Code Ann. § 40-35-113. While the trial court mentioned the defendant's proffer of remorse, the trial court did not give it significant weight because it had not been entered until almost a year and a half after Harbison was indicted.

It is clear from the record that the trial court applied the purposes and principles of sentencing and weighed the mitigating and enhancement factors before imposing the maximum sentence authorized. Because the trial court's sentence was within range and levied in compliance with the purposes and principles of sentencing, there is no error. Therefore, we conclude the defendants are not entitled to relief on this issue.

### b. Consecutive Sentences

The defendants next challenge the trial court's decision to impose consecutive sentences. Specifically, both defendants argue the trial court erroneously concluded they were dangerous offenders without making the requisite findings on the record. The State submits the trial court acted within its discretion in requiring the defendants' sentences to run consecutively. As to Brodie, we agree with the State. However, as to Harbison, we conclude that the trial court failed to make the requisite *Wilkerson* findings and, therefore, remand for consideration of the same.

In *State v. Pollard*, the Tennessee supreme court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *State v. Pollard,* 432 S.W.3d 851, 859 (Tenn. 2013). Under the expansion, the trial court has the sound discretion to determine whether a sentence should be served concurrently or consecutively. *Id*. at 860. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id*. at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

Applicable here, Tenn. Code Ann. § 40-35-115(b)(4) allows a trial court to "order sentences to run consecutively" if it finds the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a

crime in which the risk to human life is high[.]" Tenn. Code. Ann. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). However, before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In imposing consecutive sentences upon Brodie, the trial court specifically found that Brodie pushed Mr. Cook onto the ground, then hit Mr. Cook with the BB rifle and kicked him in the head several times. Based on these particular facts, the trial court deemed Brodie a "dangerous offender." The trial court further found that consecutive sentencing would be "necessary to protect the public from further acts of crime from this [d]efendant," and that the sentence was reasonably related to the severity of the offense. The trial court's finding of particular facts as to Brodie's involvement and actions during the robbery is a sufficient basis for the trial court to conclude that consecutive sentences were necessary. Therefore, this Court will apply the requisite presumption of correctness and not disturb the trial court's determination on appeal. Brodie is not entitled to relief on this issue.

During Harbison's sentencing hearing, the trial court reached the same conclusion, that Harbison was a dangerous offender. Relying on "the severity of the crime and the complete disregard for the life of Mr. Cook," the trial court simply stated that consecutive sentencing was "reasonably related to the offense." However, we agree with Harbison that the trial court made no particular findings of fact to support either the classification as a dangerous offender or the *Wilkerson* factors.

"The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings." *State v. Callaway*, No. M2004-011180CCA-R3-CD, 2005 WL 1307800, *13 (Tenn. Crim. App. June 2, 2005). Because the trial court failed to make any specific findings regarding Harbison's actions as they related to the *Wilkerson* factors in determining that he was a dangerous offender, the record cannot support consecutive sentencing. *Pollard*, 432 S.W.3d at 869 ("When trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reason on the record to support the imposition of consecutive sentences.").

Accordingly, this Court cannot presume the imposition of consecutive sentences for Harbison was reasonable or defer to the trial court's exercise of discretion. We conclude,

therefore, the trial court's classification of Harbison as a dangerous offender and the imposition of consecutive sentences was an abuse of discretion.

In *Pollard*, our supreme court explained that, when facing this situation, this Court has two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the consideration required under *Wilkerson* involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing. *Id.* Accordingly, we vacate the imposition of consecutive sentencing as to Harbison and remand to the trial court for a new sentencing hearing. The new sentencing hearing is limited to consideration of the *Wilkerson* factors to determine the propriety of consecutive sentencing in this case.

### c. Confinement

Harbison also appeals the trial court's decision to deny alternative sentencing, such as probation, and instead, order confinement. Because confinement is a statutory requirement for convictions of aggravated robbery, we will limit review to the trial court's decision to order confinement as to Harbison's other convictions only.

Generally, probation is available to a defendant sentenced to ten years or less. Tenn. Code Ann. § 40-35-303(a). A defendant who is convicted as an especially mitigated or standard offender of a Class C, D, or E felony is considered a favorable candidate for probation. Tenn. Code Ann. § 40-35-102(6)(A). In determining whether incarceration is appropriate, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses;

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1)(A)-(C). Additionally, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the

defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(4), (5).

A trial court's decision to grant or deny probation is reviewed under an abuse of discretion standard with a presumption of reasonableness when the sentence reflects the purposes and principles of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (order) (per curiam). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* Tenn. Code Ann. § 40-35-303(b); *State v. Russell*, 773 S.W.2d 913, 915 (Tenn. 1989); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

Here, because the sentence "actually imposed" upon Harbison was ten years or less, he was eligible for probation. Tenn. Code Ann. § 40-35-303(a). In compliance with Tenn. Code Ann. § 40-35-103(1)(B), the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense or that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offense. The trial court made explicit note of the fact that the case at bar had "received publicity" as evidenced by one of the defendant's efforts to change the venue prior to trial.

"When a trial court relies solely on confinement factor (B) in determining that confinement is the appropriate sentence, then "the circumstances of the offense 'as committed, must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring probation.'" *State v. Bottoms*, 87 S.W.3d 95, 103 (Tenn. Crim. App. May 31, 2001) (quoting *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991)).

Here, the egregious nature of this case rationalizes the application of the depreciating seriousness of the offense. *See State v. Mohammed*, No. M2011-02552-CCA-R3-CD, 2013 WL 1874789, *6 (Tenn. Crim. App. May 3, 2012). In the case at bar, juveniles conspired to commit a robbery while armed with a BB rifle. The defendants deliberately targeted a business and used the BB rifle to put fear into Mr. Cook. In the course of the robbery of $34, a man was beaten to death and his vehicle was stolen. The facts of this case are especially violent, horrifying, shocking, reprehensible, or otherwise of an excessive or exaggerated degree and, thus, satisfy the requirements of *Bottoms*.

Therefore, because of the appalling nature of this case, we cannot find that the trial court abused its discretion by ordering the defendant to serve his sentence in confinement. Therefore, the defendant is not entitled to relief on this issue.

### d. Constitutionality

Lastly, both defendants contend the mandate of Tenn. Code Ann. § 40-35-501(k)(1), that a defendant must serve 85% of the sentence prior to being eligible for release, is unconstitutional as applied to juveniles. Specifically, the defendants argue that because the statutory service requirement is the "harshest in our sentencing scheme," when applied to juveniles, it runs afoul of the Eighth Amendment's prohibition on cruel and unusual punishment.

In support of their argument, the defendants rely upon the Tennessee supreme court's holding in *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022). In *Booker*, our supreme court held that when applied to juveniles, Tennessee's mandatory imposition of a life sentence for homicide offenses was cruel and unusual punishment, and thus unconstitutional.

As the State points out in its brief, the supreme court, however, made clear in *Booker* that its "limited ruling" applied only to juvenile homicide offenders. *Id*. at 52. As this case's mandatory service requirement is related to the defendants' convictions for aggravated robbery, the supreme court's holding is nonbinding.

In addition, one of the supreme court's central rationales for its decision in *Booker* was that Tennessee's automatic life sentence in first-degree murder cases did not allow for a trial court to take a defendant's age into consideration. *Id*. at 63.

> "The mandatory life sentence when imposed on juvenile offenders is one-size-fits-all. Yet juvenile offenders and their crimes are not all the same. Thus, Tennessee's automatic life sentence when imposed on juvenile offenders lacks the necessary procedural protection to guard against disproportionate sentencing."

*Id.* This rationale, however, does not apply in the case at bar. While the mandatory service requirement of 85% is triggered by the conviction of aggravated robbery, a trial court maintains discretion in determining the length of sentence to protect juveniles from disproportionate sentencing. A conviction of aggravated robbery, therefore, is not a "one-size-fits-all" and is not the equivalent of the case in *Booker*. Accordingly, this Court declines the defendant's request to extend the supreme court's holding in *Booker* to the case at bar. The defendants are not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the defendants' transfers, convictions, and sentencing.  However, as to Tavares Harbison, we vacate the imposition of consecutive sentencing and remand to the trial court for further proceedings consistent with this opinion.

_____
J. ROSS DYER, JUDGE